**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **Pebble Tide LLC,** | |
| *Plaintiff*, | **Case No. 2:19-cv-00201-JRG-RSP** |
| **v.** | **PATENT CASE** |
| **Amcrest Industries LLC,** | **JURY TRIAL DEMANDED** |
| *Defendant.* | |
| **JPMorgan Chase Bank, N.A.,** | **Case No. 2:19-cv-00202-JRG-RSP** |
| *Defendants.* | |

**DEFENDANT AMCREST INDUSTRIES LLC'S RENEWED MOTION FOR
<u>JUDGMENT ON THE PLEADINGS AND BRIEF IN SUPPORT</u>**

# TABLE OF CONTENTS

I.     STAGE AND NATURE OF PROCEEDINGS ................................................... 1

II.    SUMMARY OF ARGUMENT ........................................................................ 1

III.   STATEMENT OF FACTS ............................................................................... 3

IV.    LEGAL STANDARD...................................................................................... 7

      A.   This case should be disposed of at the pleading stage through Rule 12(c)............. 7

      B.   The law of 35 U.S.C. § 101 .................................................................... 8

      C.   The law of indirect infringement ............................................................ 8

V.     ARGUMENT ................................................................................................. 9

      A.   The Asserted Patents are invalid under 35 U.S.C. § 101 ......................... 9

            1.   *Alice* Step 1: Claim 1 of the '411 Patent is directed to an abstract idea ... 10

            2.   *Alice* Step 2: Claim 1 of the '411 Patent contains no inventive concept to transform the abstract idea into patent-eligible subject matter ................ 17

            3.   The remaining claims are abstract and contain no "inventive concept"... 20

            4.   There are no claim construction or factual disputes preventing the Court from ruling on this issue at the Rule 12 stage........................................... 21

      B.   The indirect infringement claims should be dismissed......................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016)....................................................................8, 13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)............................................................................ *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018)...........................................................................16

*Appistry, Inc. v. Amazon.com, Inc.*,
   No. C15-1416RAJ, 2016 WL 3906905 (W.D. Wash. July 19, 2016) ....................22

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016).....................................................................15, 16

*Artrip v. Ball Corp.*,
   735 F. App'x 708 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1177 (2019) ..............25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................22

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
   687 F.3d 1266 (Fed. Cir. 2012)............................................................................7

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
   681 F.3d 1323 (Fed. Cir. 2012).......................................................................8, 9

*Bilski v. Kappos*,
   561 U.S. 593 (2010).................................................................................7, 8, 9, 20

*Bosarge v. Mississippi Bureau of Narcotics*,
   796 F.3d 435 (5th Cir. 2015) ...............................................................................7

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019)..............................................................16, 17, 19, 20

*Commil USA, LLC v. Cisco Sys., Inc.*,
   135 S. Ct. 1920 (2015).......................................................................................24

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014)....................................................................9, 10, 11

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018).................................................................13

*Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trustees*,
  855 F.3d 681 (5th Cir. 2017) ......................................................................7

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016).................................................12, 13, 17, 19

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016).............................................................13, 14

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
  839 F.3d 1089 (Fed. Cir. 2016).................................................................11

*Finjan, Inc. v. Blue Coat System, Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018).................................................................12

*Intellectual Ventures I LLC v. Capital One Financial Corporation*,
  850 F.3d 1332 (Fed. Cir. 2017).............................................................14, 15

*Intellectual Ventures I LLC v. J. Crew Grp., Inc.*,
  2016 WL 4591794 (E.D. Tex. Aug. 24, 2016) .........................................13

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016).................................................................17

*Interval Licensing LLC v. AOL, Inc.*,
  896 F.3d 1335 (Fed. Cir. 2018).................................................................11

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
  107 F. Supp. 3d 677 (E.D. Tex. 2015), aff'd, 639 F. App'x 637 (Fed. Cir.
  2016) ..........................................................................................................10

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
  66 F. Supp. 3d 829 (E.D. Tex. 2014) ...................................................17, 18

*Machete Productions, L.L.C. v. Page*,
  809 F.3d 282 (5th Cir. 2015) ......................................................................7

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016)...............................................................8, 12

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
  No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) ............................9

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018).................................................................12

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016).............................................................................11, 13, 16, 19

*Yanbin Yu v. Apple Inc.*,
    No. 3:18-cv-06181-JD, 2019 U.S. Dist. LEXIS 110907 (N.D. Cal. July 2,
    2019) ......................................................................................................................23

**Statutes**

35 U.S.C. § 101 ........................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. Rule 12 ....................................................................................7, 9, 21

## I.      STAGE AND NATURE OF PROCEEDINGS

On May 28, 2019, Pebble Tide LLC filed this lawsuit accusing Amcrest Industries, LLC of infringing U.S. Patent Nos. 10,261,739 and 10,303,411 (collectively, the "Asserted Patents"). D.I. 1 ("Complaint"). On August 21, 2019 Amcrest filed a Motion to Dismiss for Improper Venue and August 23, 2019, Amcrest filed a Motion for Judgment on the Pleadings because the Asserted Patents were directed to patent-ineligible subject matter. D.I. 11, 15. On September 4, 2019, Pebble responded by amending its Complaint to include the William Chang declaration, the named inventor on the Asserted Patents. D.I. 16 ("Amended Complaint); *id*. at Ex. 5 ("Chang Declaration").[1] Pebble Tide accuses Amcrest's 1080P WiFi Video Monitoring Security Wireless IP Camera of implementing the Asserted Patents' system and method of wirelessly outputting data from one device to another. *Id.*

## II.     SUMMARY OF ARGUMENT

The claims of the Asserted Patents are directed to the abstract idea of wirelessly outputting data from one device to another. More particularly, the Asserted Patents purport to have invented a universal system and method of wireless data output that operates irrespective of the types of devices, data, or communication media involved. *See, e.g.*, '411 Patent at 1:18-22. (describing the invention as a system for outputting "digital content to an output device regardless of the processing power, display screen size and memory space of the information apparatus."); *id*. at 1:27-40 (noting that the transmitting "information apparatus" can be any computing device, while the receiving "output device" can be any electronic device that outputs digital content); *id*. at 4:31-33 (claiming that the method can operate "with or without connection to a static network.").

---

[1] Pebble Tide also added allegations of willful infringement. Amended Complaint at ¶¶ 18, 28.

The Asserted Patents provide an illustrative example of the purportedly inventive concept. *Id.* at 1:63-4:43. Imagine the year is approximately 2001—the time of the priority date of the Asserted Patents. You are at an airport reading an email or news article on a mobile device equipped with a small, low resolution screen. *Id.* Because of the poor screen quality, you would prefer to print out and read a copy of the text. *Id.* But, although there are printers all around, you cannot connect your device to them for a number of reasons, including software and hardware incapability, lack of appropriate printer drivers, absence of communication means, insufficient device power, or other myriad data or formatting restrictions. *Id.* The Asserted Patents purport to solve all of these technical problems at once with an "easy, friendly and convenient process for digital output" that allows ***any*** authenticated user using ***any*** computing device to wirelessly output ***any*** kind of data to ***any*** output device. *Id.* at 4:14-15. In essence, the applicants thought, "Wouldn't it be nice if computing devices could wirelessly output data to other electronic devices without restriction?" and then claimed precisely that concept.

Yet, nothing in the claims or the specification of the Asserted Patent explains how the claimed functions are accomplished in concrete, technical terms. Nor do they purport to provide any technological improvement to the claimed components. Rather, the Asserted Patents describe these functions only at a high-level of generality and employ the recited generic components for their expected purpose. This does not raise an otherwise patent-ineligible abstract idea into an eligible inventive concept. Ultimately, the Asserted Patents do nothing more than acknowledge the common incompatibility of electronic devices, claim a universal solution to the problem, then summarily withdraw the basic idea from the public domain without disclosing any particularized application of that idea. Thus, the Asserted Patents are invalid under 35 U.S.C. § 101 for failure to claim patent eligible subject matter.

The Chang Declaration does nothing to alter these basic facts. The Chang Declaration merely repeats generic statements from the specification espousing the purported novelty and concludes that the Asserted Patents therefore contain inventive concepts. In short, the Chang Declaration recites nothing more than legal conclusions and should be afforded little to no weight.

Separately, Pebble Tide's indirect infringement claims must also fail because it did not make any allegations demonstrating that Amcrest knew of the Asserted Patents or of the alleged infringement. Nor did Pebble Tide allege that Amcrest's allegedly infringing products do not have any substantial non-infringing use. Thus, Pebble Tide's factual allegations, even when presumed true, do not support a plausible claim.

## III.   STATEMENT OF FACTS

The Asserted Patents share the same specification and figures, are continuations of the same application that resulted in U.S. Patent No. 9,965,233, and are directed to the same abstract concept of wirelessly outputting data from one device to another. The '739 Patent is entitled, "System for Capturing and Outputting Digital Content over a Network that Includes the Internet." The '411 Patent is similarly entitled, "Method for Capturing, Storing, Accessing, and Outputting Digital Content."

The Asserted Patents concede that various methods for outputting digital content were already in existence. '411 Patent at 2:25-29 ("Conventionally, an output device (e.g., a printer) is connected to an information apparatus via a wired connection such as a cable line. A wireless connection is also possible by using, for example, radio communication or infrared communication."). But the Asserted Patents claim that existing methods were inconvenient because of their "device dependent" nature. *Id.* at 2:48-53 ("Different output device models may have their own input spaces specified, designed or adopted by the output device manufacturer."). As a result of this purported problem, users needed to install different drivers for different output

devices, "add[ing] a degree of complexity and work to end-users." *Id.* at 3:5-7. This requirement "pose[d] significantly higher challenges and difficulties for mobile device users," since it "diminishes the benefit and concept of mobile (pervasive) computing and output." *Id.* at 3:16-21. These inconveniences were compounded by the "limited memory space, processing capacity and power" and "limited display screens" of mobile information apparatuses. *Id.* at 3:44-46, 62-64. Thus, applicants were compelled to develop an "easy, friendly and convenient process for digital output" that avoided these technical issues—a process that did not require device drivers to be preinstalled; that allowed small mobile devices "to output a digital document[s]" to various devices in their "full richness;" and that could connect an information apparatus to a variety of output devices through local communication and synchronization. *Id.* at 4:14-37.

 

Despite the Asserted Patents' lofty goals, however, applicants described their "solution" in purely functional terms at a high-level of generality. The functional nature of the patented concept is illustrated in the patent figures reproduced above, which depict flow diagrams for the so-called

4

"pervasive output system" (Figure 1) and "pervasive output process" (Figure 4) that implement the alleged invention. *Id.* at Figs. 1, 4.

For example, the Asserted Patents' "pervasive output system" consists of only generic components including (1) an information apparatus, (2) an output device, (3) an application server, (4) a content server, and (5) network. *Id.* at Fig. 1. The combination of these generic components purportedly results in a system with the ability to output information in its original form regardless of "processing power, display screen size, or memory space of information apparatus." *Id.* at 20:66-21:3. As provided in Figure 4, the alleged "pervasive output process" is equally bereft of technical specificity, and includes generic components such as (1) a client application obtaining objects, (2) a client application transmitting objects to a server application, (3) a server application converting the output data, (4) a server application transmitting the output data to the information apparatus, (5) the information apparatus transmitting the output data to an output device, and (6) an output device generating output. *Id.* at 21:3-22. Notably, the alleged invention only requires conventional hardware and network capabilities to function. For example:

- The <u>information apparatus</u> is ***any*** "computing device with processing capability," such as a "palmtop computer, handheld device, laptop computer, personal digital assistant (PDA), smart phone, screen phone, e-book, Internet pad, communication pad, Internet appliance, pager, digital camera, etc." *Id.* at 8:34-40.

- The <u>output device</u> "is ***any*** electronic system capable of outputting digital content or data content regardless of . . . the output medium," such as "a printer," "televisions, monitors, and projectors," or "any device capable of playing or reading digital content in audio." *Id.* at 11:20-34 (emphasis added).

- The <u>application server</u> appears to be the key component in the alleged invention to overcome the limitations of the existing output methods with its ability to convert data into appropriate, device-specific formats. But it, too, is described in conventional terms as ***any*** "server application," which, among many other purported functions, can "process the objects received to generate device-dependent output data acceptable to one or more output devices selected by a user." *Id.* at 17:21-23, 29-32.

5

- The <u>content server</u>, like ***any*** storage medium, is intended to "store digital documents." *Id.* at 18:25-27.

- And the <u>network</u> "generally refers to ***any*** type of wire or wireless link between multiple computing devices," including "the internet." *Id.* at 8:29-34 (emphasis added).

The '411 Patents' three independent claims (Claims 1, 9, 17) and the '739 Patent's one independent claim (Claim 1) cover substantially the same technology with only minor variations in implementation. Claim 1 of the '411 Patent is representative:

> 1. A method for outputting digital content, the method comprising:
>
> ***establishing***, via at least one wireless communication module included in an information apparatus. . .
>
> ***transmitting***, via the at least one wireless communication module included in the information apparatus, a device object . . .
>
> ***capturing***, using a digital camera included in the information apparatus, digital content;
>
> ***providing***, via the at least one wireless communication module of the information apparatus, the digital content . . .
>
>> ***receiving***, ***by the server software*** at the one or more servers and via the at least one network communication interface. . .
>>
>> ***storing***, ***by the server software*** at the one or more servers, the at least part of the digital content. . .
>>
>> ***receiving***, ***by the server software*** at the one or more servers, security information or authentication information from a client device. . .
>>
>> ***generating***, ***by the server software*** at the one or more servers, output data for providing to the client device. . .
>>
>> ***providing***, ***by the server software*** and via the at least one network communication interface of the one or more servers . . .

*Id.* at cl. 1. At a high level, Claim 1 recites a method of (1) capturing the information, (2) transmitting the information through a wireless network, (3) storing the information, (4) user authentication, (5) generating output information, and (6) outputting the information. More fundamentally, Claim 1 is directed exclusively to the desired ***result*** of a universal wireless output method without explaining ***how*** such capability is achieved. For example, Claim 1 simply recites

a method of "generating, by the server software at the one or more servers, output data for providing to the client device," completely omitting the purported difficulties such as the devices' "device-dependent" nature and limited "processing power, display screen size and memory space." *Id.* at 1:20-22, 2:48-49. It is also unclear what constitutes the claimed "server software executable at the one or more servers" and how is it able to convert raw data from the transmitting information apparatus to any number of receiving output devices in an acceptable data format. *Id*. at 36:2. This is especially true because the term "server software" does not appear anywhere in the specification of either Asserted Patent—only in the claims themselves.

## IV.   LEGAL STANDARD

### A.    This case should be disposed of at the pleading stage through Rule 12(c)

In the Fifth Circuit, Rule 12(c) motion standards are the same as Rule 12(b)(6) motion standards. Under Rule 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. "Dismissal under Rule 12(b)(6) is appropriate when the plaintiff has failed to allege enough facts to state a claim to relief that is plausible on its face and fails to raise a right to relief above the speculative level." *Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trustees*, 855 F.3d 681, 685 (5th Cir. 2017). While factual allegations are taken as true, viewed in the light most favorable to the plaintiff, legal conclusions are given no deference. Fed. R. Civ. Proc., Rule 12(c); *Machete Productions, L.L.C. v. Page*, 809 F.3d 282, 287 (5th Cir. 2015); *Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 439-40 (5th Cir. 2015).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). If it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter, claim construction is not required for a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the

notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

### B.    The law of 35 U.S.C. § 101

Abstract ideas are ineligible for patent protection because a monopoly over these ideas would preempt their use in all fields. *See Bilski*, 561 U.S. at 611-12. The § 101 analysis for abstract ideas requires courts to determine "whether the claims [at issue] focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Accordingly, "[c]laims that are so result-focused, so functional, as to effectively cover any solution to an identified problem are frequently held ineligible under section 101." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1265 (Fed. Cir. 2016).

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18 (internal quotations and citations omitted).

### C.    The law of indirect infringement

To establish induced infringement, the plaintiff must plausibly plead that the defendant "specifically intended their customers to infringe [the asserted patent] and knew that the customer's acts constituted infringement." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012). "Contributory infringement occurs if a party

sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *Id.* at 1337 (quoting 35 U.S.C. § 271(c)).

## V.    ARGUMENT

The claims of the Asserted Patents are invalid under 35 U.S.C. § 101 because they fail both prongs of the *Alice* test. Each of the claims is directed to the abstract idea of wirelessly outputting data from one device to another. None of the claims contain an "inventive concept sufficient to ensure that the patent in practice amounts to ***significantly more*** than a patent upon the ineligible concept itself." *See Alice*, 573 U.S. at 217-18 (emphasis added). Because Pebble Tide has failed to state a claim upon which relief may be granted, Amcrest respectfully requests that the Court grant its motion and dismiss this case with prejudice. FED. R. CIV. P. 12(b)(6).

### A.    The Asserted Patents are invalid under 35 U.S.C. § 101

To determine patent eligibility under § 101, courts must first determine whether the claims are directed to an abstract idea. *Alice*, 573 U.S. at 218. Under any plausible reading, the claims of the Asserted Patents are directed to an unpatentable abstract idea because they claim nothing more than the "longstanding," "routine" and "conventional" concept of wirelessly outputting data from one device to another. *See id.* at 218-25; *Bilski*, 561 U.S. at 611.

For § 101 purposes, all claims of the Asserted Patents can be evaluated from the perspective of representative Claim 1 of the '411 Patent because they are all "substantially similar and linked to the same abstract idea." C*ontent Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *see also Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at *8-9 (E.D. Tex. Mar. 8, 2017)

(invalidating 974 claims after analyzing only a few "representative claims" where the other claims were "substantially similar" and "linked to the same abstract idea.").

1.      *Alice* Step 1: Claim 1 of the '411 Patent is directed to an abstract idea

(a)      **Wirelessly outputting data from one device to another is a fundamentally abstract idea**

Claim 1 of the '411 Patent recites the abstract idea of wirelessly outputting data from one device to another by using an intermediate server that converts the data into an appropriate format for the receiving device. The Asserted Patents describe the system or method as a series of basic steps: (1) capturing the data using a conventional information apparatus, such as a camera; (2) transmitting the data through wireless network, such as the Internet; (3) storing the data remotely, such as on a server; (4) authenticating the receiving device, such as with any known verification method; (5) generating the output data via server software, such as with any known conversion software; and (6) outputting the data to a receiving output device, such as a printer.

As an initial matter, the concept of wirelessly outputting data from one device to another using an intermediary is a practice that can be carried out manually. *See Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp. 3d 677, 686 (E.D. Tex. 2015), aff'd, 639 F. App'x 637 (Fed. Cir. 2016) ("The concept of data collection, recognition, and storage . . . are well known and have long been performed by humans."); *Content Extraction*, 776 F.3d at 1347 (rejecting the argument that "human minds are unable to process and recognize the stream of bits output by a scanner" and noting that "humans have always performed" functions such as "data collection, recognition, and storage"). Consider the example of forensic art. A witness captures the look of a suspect through his eyes. The witness describes the look of the suspect to a forensic artist, who then draws a picture of the suspect. The resulting picture can be stored in the file cabinet at a police station or uploaded

to a database, and wirelessly accessed by others (*i.e.*, end users need not connect directly to the witness in order to receive visual information relating to the suspect).

The Federal Circuit has held that "the 'realm of abstract ideas' includes 'collecting information, including when limited to particular content.'" *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (internal quotations omitted); *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018) ("[I]nformation as such is an intangible, and that collecting, analyzing, and displaying that information, without more, is an abstract idea."). "[C]lassifying and storing digital images in an organized manner" also constitutes an ineligible abstract concept. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016); *Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

Likewise, Claim 1 of the '411 Patent is directed to a combination of these abstract processes—capturing data on an information apparatus, storing that data at a server, allowing authenticated users to access the data, converting that data as necessary, and wirelessly outputting the data via an output device. '411 Patent at cl.1. Moreover, the specification's characterization that the alleged invention broadly "relates to ***providing*** digital content to an output device" supports that the '411 Patent is directed to an abstract idea. *Id.* at 1:17-18; *see TLI Commc'ns*, 823 F.3d at 611 ("And the specification's emphasis that the present invention 'relates to a method for recording, communicating and administering [a] digital image' underscores that Claim 17 is directed to an abstract concept."). Indeed, the '411 Patent admits that "[c]onventionally, an output device (e.g., a printer) is connected to an information apparatus via a wired connection such as a cable line." *Id.* at 2:26-28. Thus, even the claimed concept of wirelessly outputting data from one electronic device to another undergirding the Asserted Patents was known in the prior art.

**(b)      Claim 1 is not directed to a specific improvement**

The analysis of whether a claim is directed to an abstract idea begins with the "focus" of the claim—*i.e.*, its "character as a whole." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). The Federal Circuit has explained that courts should examine the patent's "claimed advance to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat System, Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (internal quotations omitted). Specifically, courts should determine "whether the claims . . . focus on a specific means or method that improves the technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc.*, 837 F.3d at 1314.

The "claimed advance" of Claim 1 of the '411 Patent is a wireless universal output system that overcomes a variety of known technical limitations. *Id.* at 1:17-22. Specifically, the Asserted Patents identify various hardware and software compatibility issues, data formatting restrictions, and device processing power and memory limitations as the primary problems inhibiting the ability to output information between devices. *Id.* at 2:40-47, 3:44-46. Claim 1, however, is not directed to any specific means that can overcome these purported issues. Nowhere in Claim 1 is any means of accommodating different output devices' different input/output specifications taught. Nor does Claim 1 teach any means of minimizing the memory space, processing capacity, or power required to output the data. Instead, Claim 1 merely recites broadly the result of "providing . . . output data from the one or more servers to the client device for outputting or playing . . . the digital content, that was captured by the digital camera of the information apparatus" without any specific mechanisms. *Id.* at cl. 1. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("[M]erely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis.").

12

Further, Claim 1 of the '411 Patent "fails to provide any details for the tangible components" and "instead predominately describes the system and methods in purely functional terms" using nothing more than conventional devices and software routines. *TLI Commc'ns*, 823 F.3d at 612; '411 Patent at 8:29-40 (employing generic networks and information apparatuses); 11:20-34 (employing generic output devices). As discussed, the claimed steps here "do no more than describe a desired function or outcome, without providing any limiting detail" to "confine[] the claim to a particular solution." *Affinity Labs-DirectTV*, 838 F.3d at 1269; *see, e.g.*, '411 Patent at cl. 1 (reciting "establishing . . . a wireless communication," "transmitting," "capturing," "providing," "receiving," "storing," and "generating" data). The '411 Patent does not purport to teach any new computer capability—rather, it is directed to "independently abstract ideas that use computers as tools." *Elec. Power*, 830 F.3d at 1354; *see Intellectual Ventures I LLC v. J. Crew Grp., Inc.*, 2016 WL 4591794, at \*6 (E.D. Tex. Aug. 24, 2016) ("[T]he '370 Patent discloses nothing more than an abstract marketing idea implemented by general computer components.").

Claim 1 of the '411 Patent is thus different from what the Federal Circuit has determined to be patent eligible. For example, in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), the Federal Circuit found the claims patent eligible because the focus "is on the specific asserted improvement in computer capabilities," and particularly, the structure of the database resulted in "increased flexibility, faster search times, and smaller memory requirements." *Id.* at 1335-36, 1337. As another example, in *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), rather than using conventional user interface systems, the claims were directed to a "particular manner of summarizing and presenting information in electronic devices." *Id.* at 1362 ("The disclosed invention improves the efficiency of using the electronic device by bringing together a limited list of common functions and commonly accessed stored data, which

can be accessed directly from the main menu.") (internal quotations omitted). In contrast, nothing in Claim 1 of the '411 Patent shows any methodology that would amount to a "specific improvement in the way computers operate." *Enfish*, 822 F.3d at 1336.

### (c)     Claim 1 is untethered to a specific implementation

Claim 1 of the '411 Patent claims nothing more than the end result of a wireless universal data output system. It does not describe how the desired result is achieved or what is unconventional about the otherwise unremarkable arrangement of generic components. In this way, the function-heavy nature of the claimed components in the Asserted Patents is very similar to that in the claims held ineligible by the Federal Circuit in *Intellectual Ventures I LLC v. Capital One Financial Corporation*, 850 F.3d 1332 (Fed. Cir. 2017). In that case, the claims covered an apparatus comprising a processor and multiple components that performed certain functions. *Id.* at 1339. The Federal Circuit found the claimed components did not confer eligibility because the claims did nothing more than recite the functions of those components. *Id.* at 1342 ("Rather, the claims recite both a generic computer element—a processor—and a series of generic computer "components" that merely restate their individual functions—i.e., organizing, mapping, identifying, defining, detecting, and modifying. That is to say, they merely describe the functions of the abstract idea itself, without particularity.").

The same is true here. The '411 Patent invokes a client application and an application server by describing only what they can do, but absent any particularity as to how it is achieved. For example, the '411 Patent states that the client application can "provide[] pervasive output capability," which in turn provides it with a wide range of functionalities such as the ability to "[c]oordinat[e] with output device[s]" and to "manage the process of transmitting output data." '411 Patent at 10:14-17; 10:32-11:16. Yet, there are no details as to how these results are achieved, only generic disclosures that the "client application" includes executable "software and data" and

14

"may be variously implemented in an information apparatus and may run on different operating systems or platforms." *Id.* at 10:17-31. "[T]he claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more." *Capital One*, 850 F.3d at 1341 (citing *Elec. Power*, 830 F.3d at 1356). As with the "unique identifier" in *Secured Mail*, the '411 Patent describes the recited "client application" in purely functional terms, with no particularity as to how those functions are carried out. *See Secured Mail*, 873 F.3d at 910 ("There is no description of how the unique identifier is generated" and "[t]he fact that the sender generates a barcode, which itself is not claimed, does not render the idea any less abstract"). Indeed, the "client application" is not even claimed in the Asserted Patents.

As another example, the '411 Patent invokes an "application server" that purportedly overcomes the "device-dependent" limitations of contemporary output devices. '411 Patent at 17:12-15. The application server is ***the key component*** to the '411 Patent because it alone possesses the ability to "process the objects received to ***generate device-dependent output data*** acceptable to one or more output devices selected by a user." *Id.* at 17:29-32 (emphasis added). But despite its importance, the only technical description of the application server provided by the specification is that it is "server application" comprised of "software and data." *Id.* at 17:21-23. Like the other computer-implemented claims found patent-ineligible, the '411 Patent merely claims a desired result without explaining "how this would be technologically implemented" as the claims specify no "particular way of programming or designing the software." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241, 1244 (Fed. Cir. 2016); '411 Patent at 17:12-15 ("Application server preferably includes at least an operating system for supporting a plurality of application software to implement the functionalities of the application server [] and to provide services to its clients."). Such "vague, functional" terms, "devoid of technical explanation as to how to

15

implement the invention," cannot confer eligibility. *TLI Commc'ns*, 823 F.3d at 614-15 (although the claim required "concrete, tangible components such as 'a telephone unit' and a 'server,' the specification [made] clear that the recited physical components merely provide a generic environment in which to carry out the abstract idea").

The limitation of "by the server software" does not change the functional nature of Claim 1 of the '411 Patent. Claim 1 recites a method of "receiving," "storing," "generating" and "providing" data "***by the server software***," but it does not disclose what "server software" is. It is entirely unclear as to how the server software is programmed, how it is different from the existing software, or how it is able perform so many different functions as claimed. In fact, like the claimed "client application", the claimed "server software" is not even mentioned in the specification. Thus, Claim 1 of the '411 Patent is directed to the abstract idea of wirelessly outputting data from one device to another and is totally devoid of any specificity that could transform the function-dependent (ineligible) claims to computer-improving (eligible) claims. *See, e.g.*, *Apple*, 842 F.3d at 1241 (affirming that the claims were patent-ineligible where "[t]hey do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."); *cf. Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), as amended (Nov. 20, 2018) (holding claims eligible because they were directed to "a ***non-abstract*** computer-functionality improvement [] done by ***a specific technique*** that departs from earlier approaches to solve ***a specific computer problem***") (emphasis added).

Moreover, by claiming only the desired result of a wireless universal output method, Claim 1 of the '411 Patent is "drafted in such a result-oriented way that [it] amount[s] to encompassing the 'principle in the abstract' no matter how implemented." *ChargePoint*, *Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (citing *Interval Licensing*, 896 F.3d at 1343). Indeed, the

'411 Patent risks preempting *all* methods or systems for outputting data from one device to another given the functional focus and breadth of the claim language. *See, e.g.*, *id.* (the claim was directed to an abstract idea when "the broad claim language would cover any mechanism for implementing network communication on a charging station"); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 843 (E.D. Tex. 2014) (finding "preemptive effect . . . broad" where "the claims [were] largely functional in nature, they [did] not provide any significant description of the particular means by which the various recited functions are performed" and "[a]ll that [was] disclosed [was] the ultimate objective"). The fact that the abstract concept of the '411 Patent is generally directed to electronic means of outputting data is irrelevant because an abstract idea "does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as [wirelessly outputting data from one device to another]." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1319 (Fed. Cir. 2016) (internal citation omitted) (method for "tracking financial transactions to determine whether they exceed a pre-set spending limit (i.e., budgeting)" using the Internet and telephone networks "[did] not render the claims any less abstract"); *see Elec. Power*, 830 F.3d at 1354 ("Most obviously, limiting the claims to [a] particular technological environment . . . is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core."). Claim 1 of the '411 Patent thus fails *Alice* step one.

2.      <u>***Alice* Step 2**</u>**: Claim 1 of the '411 Patent contains no inventive concept to transform the abstract idea into patent-eligible subject matter**

Because Claim 1 of the '411 Patent is directed to an abstract idea, the next step is to determine whether it contains an "inventive concept . . . sufficient to ensure that the patent in practice amounts to ***significantly more*** than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18 (emphasis added). It does not. Representative Claim 1 of the '411 Patent fails

*Alice*'s second step because it is broadly generic and contains no meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

Although the stated goal of the '411 Patent is to provide a wireless universal output system that overcomes a number of known technical impediments, not a single ***technical improvement*** is discussed, much less claimed. *Loyalty Conversion Sys.*, 66 F. Supp. 3d at 845 (finding a lack of inventive concept when patents "simply describe a problem, announce purely functional steps that purport to solve the problem, and recite standard computer operations to perform some of those steps"). For example, the information apparatus can be any computing device including a "palmtop computer, handheld device, laptop computer, personal digital assistant (PDA), smart phone, screen phone, e-book, Internet pad, communication pad, Internet appliance, pager, digital camera, etc." '411 Patent at 8:34-42. Likewise, the output device can be any electronic device including "a printer," "televisions, monitors, and projectors," or "any device capable of playing or reading digital content in audio." *Id.* at 11:20-34. And the claimed network is wireless communication, such as the Internet. *Id.* at cl. 1. The claimed "network communication interface" also does not indicate any technical improvement, as it refers to conventional components such as a "processing unit, a memory unit, a storage unit and an input/output control unit" featuring "a keyboard, a touch-sensitive or non-touch sensitive screen, push buttons, soft keys, a stylus, a speaker, a microphone, etc." *Id.* at 8:43-52.

Moreover, the limitations of "storing . . . at least part of the digital content . . . in the memory or storage of the one or more servers" and "receiving . . . security information or authentication information from a client device" do not constitute any inventive concept sufficient to confer patent eligibility. *Id.* at cl. 1. Adding generic functions such as storing data and user authentication to the routine operations of conventional devices does not amount to an inventive

concept. *See, e.g.*, *TLI Commc'ns*, 823 F.3d at 613-14 (Fed. Cir. 2016) (ineligible subject matter where the specification described the claims "as either performing basic computer functions such as sending and receiving data, or performing functions 'known' in the art."). Finally, the limitation of "transmitting . . . a device object that includes device information" does not confer patentability, since the mechanism of obtaining the device object is not disclosed and limiting the type of data to transmit does not make the concept of transmitting data any less abstract. '411 Patent at cl. 1. *Elec. Power Grp.*, 830 F.3d at 1354 ("[L]imiting the claims to [a] particular technological environment . . . is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core.").

Additionally, "[a]t *Alice* step two, it is irrelevant whether [the alleged unconventional feature] may have been non-routine or unconventional as a factual matter." *BSG*, 899 F.3d at 1290-91 ("As a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more' to it."). For example, in *ChargePoint*, the alleged inventive concept was "network control," which is itself an abstract idea. 920 F.3d at 774. The Federal Circuit held that "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than the ineligible concept." *Id.* (internal quotations omitted). Here, the claimed advance of the '411 Patent is a wireless universal output system that overcomes a variety of known technical limitations. But as in *ChargePoint*, a wireless universal output system consisting of the basic steps of obtaining, transmitting, storing, accessing, converting, and outputting data, is an abstract idea itself. *See Secured Mail*, 873 F.3d at 910 ("The fact that an identifier can be used to make a process more efficient, however, does not necessarily render an abstract idea less abstract."). Moreover, as previously detailed, the '411 Patent is wholly devoid of any technical specificities as to how is the alleged wireless universal output process

19

accomplished. Thus, the alleged invention is "simply an abstract-idea-based solution implemented with generic technical components in a conventional way." *ChargePoint*, 920 F.3d at 775.

### 3.   The remaining claims are abstract and contain no "inventive concept"

The remaining claims of the Asserted Patents recite the same abstract idea of wirelessly outputting data from one device to another. Indeed, the independent claims of both Asserted Patents are substantially similar except that Claim 1 of the '411 Patent is directed to a method, whereas claims 9, 17 of the '411 Patent and Claim 1 of the '739 Patent are directed to a system. Each of these claims includes almost identical limitations as in Claim 1 of the '411 Patent. Thus, the remaining independent claims are ineligible for the same reasons.

The dependent claims fare no better. They recite either token pre- or post-solution limitations or purely conventional functions performed by generic computer components. *See Mayo*, 566 U.S. at 79 ("Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law.") (internal citations omitted); *Bilski*, 561 U.S. at 610-11 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'") (internal quotations omitted). The dependent claims of the Asserted Patents are summarized in the table below.

| Dependent Claim | Directed to |
| --- | --- |
| '739 Patent: Claims 2, 3, 5, 6<br>'411 Patent: Claims 2, 3, 5, 6, 10, 13, 14 | Information apparatus features and functionality |
| '739 Patent: Claim 4 | Client software functionality |
| '739 Patent: Claim 7<br>'411 Patent: Claims 7, 15, 19 | Wireless communication networks and protocol functionality |
| '739 Patent: Claim 8<br>'411 Patent: Claims 8, 16, 20 | Data formatting output functionality by the server software |
| '411 Patent: Claims 4, 11, 12, 18 | Client device functionality |

As an illustrative example, Claim 4 of the '411 Patent recites a list of potential "client device" features using the same generic, high-level, functional language as Claim 1 of the '411 Patent, including the ability to "search[] . . . for an available information apparatus," "provid[] . . . for user selection," and "receiv[e] . . . a selected information apparatus from [a] list." '411 Patent at cl. 4. But these are conventional functions routinely found in contemporary user interfaces and which could be performed with technologies much older than computers (*e.g.*, by hand). As another example, Claims 6 and 14 of the '411 Patent and Claim 6 of the '739 Patent limit the information apparatus to include at least one of "a microphone, a speaker, a mouse, a keyboard, a touch-sensitive or a non-touch sensitive screen, push buttons, soft keys, or a stylus." *Id.* at cls. 6, 14; '739 Patent at cl. 6. Yet, adding well-known peripheral electronic devices does not amount to a meaningful limitation that confers patentability. *See Ultramercial*, 722 F.3d at 1346 ("claim . . . will not be limited meaningfully if it contains only insignificant or token pre or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment").

Like Claim 1 of the '411 Patent, the remaining independent and dependent claims are directed to the same abstract idea of wirelessly outputting data from one device to another and are altogether devoid of any "inventive concept." They are thus patent-ineligible under § 101.

### 4.   There are no claim construction or factual disputes preventing the Court from ruling on this issue at the Rule 12 stage

Perhaps sensing the Asserted Patents' vulnerability to an early § 101 challenge, Pebble Tide recently amended its Complaint to incorporate the Chang Declaration. D.I. 11 at Ex. E. The Chang Declaration, however, is nothing more than an attempt to avoid early resolution of the threshold ineligibility issue. The Court should disregard Pebble Tide's effort to inject attorney argument and legal conclusions masquerading as properly pled facts into its Amended Complaint

21

via the Chang Declaration, which includes:

- Several pages devoted to Mr. Chang himself, wherein he highlights his technical expertise and professional achievements. Chang Declaration at 2-4.

- One page opining on the level of ordinary skill in the art. *Id*. at 4-5.

- Several pages assessing the prior art, the problems in the prior art, and how the Asserted Patents overcame these purported problems. *Id*. at 6-11.

- Several pages suggesting that various claims terms are used in unconventional or limiting ways and therefore must be construed. *Id*. at 11-15.

- A series of legal opinions including that "the subject matter of the claims in the Patents-in-Suit [] are significantly more than an abstract idea and demonstrate an improvement in technology" and that the "claim limitations… are unconventional and significantly more than an abstract idea. *Id*. at 2.

Courts faced with plaintiffs who appended expert declarations to their complaints and who argued that the opinions in those declarations should be accepted as true have found those arguments to be "nonsense." *See, e.g., Appistry, Inc. v. Amazon.com, Inc*., No. C15-1416RAJ, 2016 WL 3906905, at *6 (W.D. Wash. July 19, 2016). For example, in *Appistry* the plaintiff's "Complaint include[d] the declaration of Dr. Matthew Green. . . who opine[d] that the claims . . . cover[ed] 'a new and novel mechanism, system, and/or method over the prior art for distributed computing.'" *Id*. The court was clear about the impropriety of the plaintiff's tactics:

> "Plaintiff's position is absurd. Requiring the Court to accept such facts or legal conclusions (even in the form of an early expert declaration) would permit any plaintiff to circumvent the § 101 inquiry on an early motion to dismiss or motion for judgment on the pleadings simply by including a few lines attesting to the novelty of the invention." *Id*. at *6, n.6.

Pebble Tide is attempting the same circumvention tactics. The sole purpose of the Chang Declaration is to avoid an adverse § 101 determination by injecting legal conclusions styled as facts about why the Asserted Patents are allegedly not abstract, why they allegedly contain inventive concepts, or why Uniden's legal arguments regarding invalidity are allegedly wrong. These are all legal conclusions that the Court need not accept as true and thus have no bearing on the § 101 issue. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

22

Moreover, the Chang Declaration's description of the prior-art problems purportedly solved by the Asserted Patents is nothing more than a restatement of the abstract idea undergirding the Asserted Patents. *See, e.g.,* Chang Declaration at ¶ 32 ("The claimed teachings of the Patents-in-Suit disclose an improvement in computer technology, by solving the problem of widespread incompatibility between pervasive devices and corresponding output devices, by device type, regardless of the specific types and format requirements between particular pervasive devices and output devices."). But courts have determined that such circular reasoning is insufficient to avoid an adverse § 101 determination. *See Yanbin Yu v. Apple Inc.*, No. 3:18-cv-06181-JD, 2019 U.S. Dist. LEXIS 110907, at *17 (N.D. Cal. July 2, 2019) (finding that claim 1 lacked an inventive concept because "the complaint does not allege that the claimed invention contains unconventional digital camera elements beyond the abstract idea [because t]here are no allegations that the asserted combination and arrangement of well-understood, routine and conventional digital camera components goes beyond the abstract idea of using multiple images to enhance one image.") (internal quotations omitted).

This case is thus unlike *Aatrix*, *Cellspin*, and *Berkheimer*, where plaintiffs' non-conclusory allegations were sufficient to establish at least a factual dispute as to whether the patents-at-issue claimed an inventive concept. In *Berkheimer*, the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." 881 F.3d 1360, 1369 (Fed. Cir. 2018). The Federal Circuit then examined whether the improvements described in the specification were included in the claims. *Id.* To the extent that the claims captured those inventive features, the Federal Circuit found a "factual dispute regarding whether the invention describe[d] well-understood, routine, and conventional activities." *Id*. But where the claims did not recite the purportedly inventive features described in the

specification, the Federal Circuit concluded that they were directed to patent ineligible subject matter under § 101. *Id.* That concern is inapplicable here, however, because neither the claims nor the specification of the Asserted Patents describe any unconventional components or teach the use of generic components in an unconventional manner.

Similarly, in *Aatrix*, plaintiff alleged that the unique importation of data from third-party programs improved the functioning of the computer. *Aatrix*, 882 F.3d at 1127. There are no such specific or unique improvements claimed here. And in *Cellspin*, the amended complaint identified "several ways in which its application of capturing, transferring, and publishing data was unconventional." *Cellspin*, 927 F.3d at 1316. Again, the Asserted Patents claim no unconventional means for the claimed implementation of the abstract idea of wirelessly transmitting data from one device to another. Because the Asserted Patents disclose no unconventional mechanisms of implementing the claimed idea, and there are no claim construction issues affecting the *Alice* analysis or factual disputes on the record, the issue of the patent eligibility of the Asserted Patents is ripe for the Court's consideration.

### B.   The indirect infringement claims should be dismissed

Pebble Tide's induced and contributory infringement claims should be dismissed because Pebble Tide failed to plead any knowledge of the alleged infringement and a lack of substantial non-infringing use.

"[L]iability for inducing infringement attaches ***only*** if the defendant knew of the patent and that the induced acts constitute patent infringement." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015) (internal quotations omitted) (emphasis added). To establish contributory infringement, a plaintiff "must plausibly allege that the accused infringer ***knew of the asserted patents***" and "plead facts that allow an inference that the components sold or offered for sale have

*no substantial non-infringing uses*." *Artrip v. Ball Corp.*, 735 F. App'x 708, 713 (Fed. Cir. 2018),

cert. denied, 139 S. Ct. 1177 (2019) (emphasis added).

Pebble Tide's induced and contributory infringement claims must fail because Pebble Tide

did not even attempt to allege that Amcrest knew of the Asserted Patents before providing the

allegedly infringing products to customers, or that Amcrest knew the customers' acts would

allegedly infringe the Asserted Patents. Complaint at ¶¶ 16-17, 25-26. Nor did Pebble Tide allege

that Amcrest's allegedly infringing products have no substantial non-infringing uses. *Id.* at ¶¶ 17,

26. Pebble Tide made legal conclusions, rather than factual allegations in its Complaint. *Id.* at ¶¶

16-17, 25-26. Even when taking all of Pebble Tide's allegations as true, nothing in its Complaint

gives rise to a reasonable inference that Amcrest knew of the Asserted Patents prior to offering its

products or knew that its customers' acts constituted the alleged infringement, or that the allegedly

infringing products have no substantial non-infringing uses.

Dated: September 19, 2019                           FISH & RICHARDSON P.C.


By:  */s/ Michael Ellis*
     Neil J. McNabnay
     macnabnay@fr.com
     Texas Bar No. 24002583
     Ricardo J. Bonilla
     rbonilla@fr.com
     Texas Bar No. 24082704
     Michael Ellis
     ellis@fr.com
     Texas Bar No. 24102726

     1717 Main Street, Suite 5000
     Dallas, Texas 75201
     (214) 747-5070 (Telephone)
     (214) 747-2091 (Facsimile)

     **Attorneys for Defendant**
     **Amcrest Industries LLC**

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 19, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Michael Ellis*
Michael Ellis